IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
―――――――――――――――――――――――――――

UNITED STATES OF AMERICA,

      v.                            20-MR-

DAVID BURGIN,

              Defendant.
―――――――――――――――――――――――――――

## GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO REVOKE THE MAGISTRATE JUDGE'S RELEASE ORDER

The United States of America by and through its attorneys, James P. Kennedy, Jr., United States Attorney for the Western District of New York, and Timothy C. Lynch, Assistant United States Attorney, hereby file this Memorandum of Law in Support of its Motion for Review of Magistrate Judge H. Kenneth Schroeder, Jr.'s Determination on Detention.  See Docket Entry, 2/24/2020.

## I.      BACKGROUND AND PROCEDURAL HISTORY

On February 20, 2020, the defendant, DAVID BURGIN, was charged in a federal criminal complaint with conspiring to possess with intent to distribute, and to distribute, 500 grams or more of a mixture and substance containing cocaine; maintaining a drug-involved premises; and possession of firearms in furtherance of drug trafficking.  See Exhibit A.  The charges stem from an Erie County Sheriff's Department investigation that began on February 19, 2020.

On February 19, 2020, the Erie County Sheriff's Department was able to obtain cooperation from an individual who was found in possession of a large quantity of cocaine and several loaded handguns.  In a post-<u>Miranda</u> interview, the cooperator explained that the cocaine found in his possession and seized at his residence were supplied to him by DAVID BURGIN approximately 1 week prior.   The cooperator stated that BURGIN utilizes his nephew, RODNEY PIERCE, to deliver the cocaine.

The cooperator was later used to contact PIERCE to set up the purchase of a kilogram of cocaine.  Following a series of text messages and phone calls, PIERCE agreed to meet the cooperator at the AutoZone on Broadway Avenue, in Buffalo.  After PIERCE was observed in the parking lot of the AutoZone, law enforcement observed PIERCE leave the area, go to 56 Grimes, where he was observed exiting his vehicle with a black bag and entering 56 Grimes.  PIERCE later exited 56 Grimes, entered his vehicle, and went to the AutoZone, where he was taken into custody by law enforcement and found to be in possession of more than a kilogram of cocaine.  <u>See</u> Exhibit B, PowerPoint Presentation, Slide 1.[1]

Shortly after PIERCE was arrested, law enforcement returned to 56 Grimes and observed a white Toyota Tundra, which BURGIN is known to drive, parked out front.  After the Toyota Tundra left the front of Grimes, law enforcement stopped the vehicle and approached the driver, who was determined to be BURGIN.  When asked where he was coming from, BURGIN responded, "the gym," which law enforcement knew was false. When asked whether he was anywhere else, he invoked his right to counsel.

---

[1] Exhibit B is in the same PowerPoint presented to the magistrate judge, except that it has page numbers now for easier reference.

That evening, the Honorable Kenneth F. Case, Erie County Court Judge, issued a search warrant for 56 Grimes Street, Lower, and later issued a search warrant for 56 Grimes Street, Upper.  During a search of 56 Grimes, law enforcement seized the following: (1) two handguns; (2) one loaded semi-automatic assault rifle; (3) one assault rifle; (4) approximately $250,000 in U.S. currency; (5) 2.35 kilograms of suspected cocaine; (6) 17.5 pounds of marijuana; (7) 114 grams of suspected fentanyl; (8) two narcotics presses; (9) a money counter; (10) two vacuum sealers; (11) two large containers of cutting agents for narcotics distribution; (12) packaging materials; (13) books and records; (14) eleven hard drives; and (15) mail addressed to DAVID BURGIN at 79 Brunswick Boulevard, Buffalo.  Photographs of some of these items are depicted in Exhibit B at Slides 2 through 5.

On February 21, 2020, in the early morning hours, federal search warrants were executed at several locations in the City of Buffalo, including BURGIN's residence at 79 Brunswick, Buffalo, New York and BURGIN's residence located at 73 Rogers, Buffalo New York.  During the search of 79 Brunswick, law enforcement seized a handgun and a rifle.  See Exhibit B, Slides 6 & 7.  In addition, records relating to BURGIN's interest in several locations in the City of Buffalo, including 56 Grimes and 73 Rogers, as well as notes regarding high-end jewelry.  Finally, debit cards in the names of David Washington and Blue Money Entertainment were also found in the residence.  BURGIN's association with Washington is significant, because WASHINGTON is a well-known, high level drug trafficker operating in the City of Buffalo, who is charged in a federal Indictment with conspiracy to possess with intent to distribute, and to distribute, 5 kilogram of more of cocaine.  See Exhibit D.

Although BURGIN does not have a criminal history, he has been a target of federal law enforcement since as early as 2004.  In 2007, BURGIN was the target of a Title III investigation and confidential sources, at the time, estimated that BURGIN was responsible for distributing between 30 and 50 kilograms of cocaine per month.  Although the investigation did not result in BURGIN's arrest, it did result in the arrest of several of BURGIN's associates, including Robert Dewitt Stephenson and Vincent Lagrange.

At the time of the 2007 investigation, the Internal Revenue Service was aware of BURGIN's scant history of reportable income, but an extensive record of known expenditures.  When the investigation of BURGIN was renewed in 2015, IRS again looked at BURGIN's recent history of reportable income and known expenditures and concluded that his expenditures continued to far outweigh his reportable income.  In fact, for the tax years 2004-2006 and 2015-2018, his reported income was $108,827 and his known expenditures during the same time period was $1,033,307, a difference of more than $900,000. See Exhibit B, Slide 13.

At the detention hearing, BURGIN claimed that in one of the tax years not listed by the government, he made more than $300,000.  The government has requested this information from the IRS.  Once this information is obtained, the government will provide the information to the Court in a supplemental filing.

Although law enforcement has long suspected BURGIN's involvement in large-scale drug trafficking, specific information regarding his activities was not obtained until a

confidential source met with BURGIN on March 22, 2017 at a Buffalo hotel room.  This room was wired with video and audio.  During that meeting, BURGIN made clear to the source that he could purchase 15 kilograms of cocaine for $30,000 a kilogram at the time of the transaction and the cocaine did not have to have it fronted to him.  See Exhibit B, Slides 14, 15, & 19.  In other words, BURGIN told the source he would have $450,000 in U.S. currency at the time of the transaction before the cocaine was even sold to BURGIN's Buffalo customers.  This is indicative of a large-scale trafficker, who has access to a significant sums of money.  During the meeting, BURGIN also told the source that he could purchase 500 pounds of marijuana at a time.  See Exhibit B, Slide 16.  Finally, BURGIN explained to the source that he had a business in Jamaica that employs more than 200 workers, that you need to set up "legal" business so that you can get out the drug business, and that he makes "70" (a reference to 70 thousand) a month "completely legal."  See Exhibit B, Slides 17, 18, 20, & 21.

The pretrial services report, which recommended BURGIN's release and which was relied upon by Magistrate Judge H. Kenneth Schroeder to support his release order, is replete with false and incomplete information provided BURGIN.  For example, when asked about international travel, he said that he traveled to Jamaica for pleasure, when, in fact, he has a business there.  When BURGIN was asked about his employment, he said that he worked off the books for a construction company for the past 10 years, but made no mention of any other employment or ownership in a business.  Finally, when asked about properties that he owns, he listed only 239 Stockbridge and 73 Rogers, but a ledger at his residence listed these residences and several more, including properties on Bennett Village Terrace, Grimes, and

Brunswick, see Exhibit B, Slide 7, and a Erie County deed shows BURGIN owns 54 Bennett Village Terrace.[2]  See Exhibit F.

At the detention hearing, the government, utilizing a PowerPoint presentation, which is attached as Exhibit B, proffered that the defendant posed a danger to the community and a flight risk.  The government asked the Magistrate Court to take into account the rebuttable presumption that the defendant was a "risk of flight" and "danger to the community," as set forth in Title 18, United States Code, Section 3142(e)(3)(A), since the defendant was charged with a Controlled Substances Act offense for which the maximum term of imprisonment is more than 10 years, was charged with a firearms offense, and was facing a maximum sentence of life .  The government also set forth the Title 18, United States Code, Section 3142(g) factors that warranted the defendant's pretrial detention.  BURGIN's attorney, without setting forth proof to rebut the presumption, argued that he was neither a flight risk nor a danger to the community.  In doing so, defense counsel relied heavily on the pretrial services report, letters submitted to the Court, his community ties, the defendant's claimed business interests, and the lack of evidence linking him to the guns and drugs found at 56 Grimes to support his argument.  See Exhibit E at 26-33.

In ordering the defendant's release, Magistrate Judge Schroeder made the following statements regarding his belief that the government delayed bringing charges against

---

[2] At the time of the detention hearing before the magistrate judge, government counsel was not aware that BURGIN owned 54 Bennett Village Terrace, so this information was not proffered before the magistrate judge.

BURGIN, which in his view served to rebut the presumption of danger to the community and the risk of flight:

> So we are basically dealing with two presumptions: The one relied on by the Government in the Bail Reform Act, which is the statutory presumption; and the one to which each defendant is automatically entitled to under the Constitution of the United States.

> And when I weigh the presumptions – a constitutional presumption against a statutory presumption -- it is my opinion both legally and justiciable that the constitutional presumption is a much weightier, a much more impressive presumption

> The presentation and the proffer put forth by the government is a substantial one, at least as to what has been alleged as having been recovered in the recent searches conducted pursuant to search warrants and disclosures obtained by way of apparently either Title 3 orders or other types of investigatory tools.

> But, once again, we still have the presumption of innocence to which each defendant is entitled and that presumption remains with each defendant until such time as they are found guilty beyond a reasonable doubt after a trial based on legally competent evidence.

> I do have concern as to the foundation which the government is relying upon to support its motion in addition to the presumption.  And that is the so-called history that was proffered. And what causes my concern was briefly addressed by defense counsel and it's something that I find in a number of cases that come before this Court but most specifically, and particularly, in drug cases and child pornography cases.  And that is the claim by the government that the defendant charged constitutes a danger and must be detained, but yet more often than not the government is aware of the activity for long periods of time before it takes any action, which causes me intellectual honesty concerns.

> That if the government is aware of somebody conducting activity that it says is now dangerous, which warrants immediate removal of that person's freedom -- why wasn't that done as defense counsel indicated it first became known?

> In this particular case, the proffer indicates the investigation with respect to each defendant are of a number of years duration, and during that number of years, the defendants were apparently at liberty and were going about whatever they were going on about.

> So that so-called pressure of immediate action really isn't there, when

you consider in that context of this activity allegedly having occurred over a lengthy period of time.

Also, the government makes reference to IRS investigations, large volumes of cash, but yet, as the government has now acknowledged, no IRS action was ever taken against the defendants, especially BURGIN, either civilly for taxes -- for collection of taxes or criminally for fraudulent tax violations.

And so, quite frankly, the government's inaction as to the so-called serious events causing me to conclude that the presumption really has been rebutted by the government's own inaction.

If the defendants were so dangerous, the government should have taken action. If the defendant BURGIN was so violative of the tax laws, IRS and the government should have prosecuted or at least civilly undertaken steps to collect those tax dollars. Neither of which occurred.

And so I say to myself, how can I intellectually say then these defendants are such a danger or are such habitants of illegal conduct that there are no terms and conditions that I could reasonably impose to assure the safety of the community or to uphold the principles of the Constitution, especially the principle of the presumption of innocence.

Bail is not meant to be a punitive tool. Bail is a constitutional right to what every defendant charged with a crime is entitled to be considered for.

I also take into account the pretrial services report as to each defendant and the experience of each of the probation officers preparing those reports.

Both defendants appear to have no criminal records of any substance. There are convictions for DUI or DWI by the defendant Pierce back in 2013 and 2019, but other than that he has no reported criminal convictions

As to the defendant Burgin, the Pretrial Services report shows no criminal convictions of any nature.

This Court has had a number of drug cases involving defendants with substantial criminal records where the government has had no objection to their release.

And so when I consider, once again, the circumstances and the facts made known in this case in their totality, coupled with the presumption of innocence, I've heard nothing that really indicates to me even by a scintilla of evidence as to the risk of flight because there are steps that I can take to minimize the risk of flight.

Once again as to dangerousness to the community, that burden is one of clear and convincing evidence and apparently the government didn't believe there was clear and convincing evidence of dangerousness when it became aware of the alleged conduct that it says is now dangerous back in 2017, 2018, and 2019.  [The magistrate judge then ordered defendant BURGIN on release conditions.]

Exhibit E at 45-48.

Notably absent from Magistrate Judge Schroeder's oral decision is any significant reference to the kilograms of drugs, handguns, assault rifles, sophisticated traps, and thousands of dollars seized from residences linked to the defendant.  In finding that there was not even "a scintilla of evidence as to risk of flight," Magistrate Judge Schroeder failed to mention the government's proffer regarding BURGIN's business interests in Jamaica, his sketchy employment history, his apparent interest in several properties, and the thousands of dollars seized from BURGIN's residences.  Instead, he chose to focus on the timing of the government's charging decision, rather than the defendant's criminal behavior, as required by the Bail Reform Act.

Because there are no conditions, including those set by the Magistrate Court, that can assure the defendant's return to court or the safety of the community, the government now provides this memorandum in support of its motion for review of the decision and order releasing the defendant from custody and for a continued stay of Magistrate Judge Schroeder's release order until this Court has reviewed the matter.

## II.   <u>STANDARD OF REVIEW</u>

Review of a magistrate judge's release order is <u>de novo</u>.  "[W]here a defendant is ordered released by a magistrate judge, the government may, under 18 U.S.C. § 3145(a)(1), move for revocation of the release order before the district court.  Upon such motion, the district court must perform a <u>de novo</u> review of the magistrate judge's release order."  <u>United States v. Boorman</u>, 130 F. Supp.2d 394, 398 (W.D.N.Y. 2001) (citing <u>United States v. Leon</u>, 766 F.2d 77, 80 (2d Cir.1985)).  In <u>United States v. Leon</u>, the Second Circuit held that a district court should "not simply defer to the judgment of the magistrate, but reach its own independent conclusion."  <u>Leon</u>, 766 F.2d 77, 80 (2d Cir.1985); <u>see also</u> <u>United States v. Colombo</u>, 777 F.2d 96, 100 (2d Cir. 1985).  The reviewing district court is also not limited to the record made at the magistrate court.   Rather, the Court may take additional evidence or conduct a new evidentiary hearing altogether.  "When making its <u>de novo</u> review, the district court may rely on the record of the proceedings before the magistrate judge and may also accept additional evidence."  <u>Boorman</u>, 130 F. Supp.2d 394, 398 (W.D.N.Y. 2001); <u>see also</u> <u>Colombo</u> 777 F.2d 96, 98 (2d Cir. 1985).

## III.   <u>GOVERNING STANDARDS</u>

When the government's motion for detention is based upon the defendant's dangerousness, it "has the burden of establishing defendant's dangerousness by 'clear and convincing evidence.'" <u>United States v. Chimurenga</u>, 760 F.2d 400, 403 (2d Cir. 1985); <u>see also</u> 18 U.S.C. § 3142(f).  When the government's motion for detention is based upon the defendant's risk of flight, the "government's burden of proof . . . is not by clear and convincing evidence, but rather by a preponderance of the evidence." <u>Chimurenga</u>, 760 F.2d at 405.

"In a presumption case such as this, a defendant bears a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight."  United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001).  See also United States v. Rodriguez, 950 F.2d 85, 88 (2d Cir. 1991) ("[A] defendant must introduce some evidence contrary to the presumed fact in order to rebut the presumption.").  "Once a defendant has met his burden of production relating to these two factors, the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court."  Mercedes, 254 F.3d at 436.

In making a determination as to whether a defendant should be released, the Court must consider the factors enumerated under 18 U.S.C. § 3142(g).  The four factors are, in relevant part:

(1)    the nature and circumstances of the offense charged;

(2)    the weight of the evidence against the person

(3)    the history and characteristics of the person including

(A)    the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings;

(B)    whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence…

(4)    the nature and seriousness of the danger to any person or the community that would be posed by the person's release

18 U.S.C. § 3142(g).

# IV.    ARGUMENT

The defendant is both a flight risk and a danger to the community.  The Magistrate Court did not fully consider the factors as set forth in 18 U.S.C. § 3142(g).  Rather, he examined the government's investigation and erroneously determined that the government's alleged inaction served to rebut the presumption of dangerousness and risk of flight.  The government's proffer, however, established by clear and convincing evidence that the defendant is a danger to the community, and by a preponderance of the evidence that he is a risk of flight.  As such, this Court should revoke Magistrate Judge Schroeder's release order. Before addressing the factors in 3142(g), the government will address the flawed rationale applied by the magistrate judge in ordering BURGIN's release on conditions.

## A.    The Magistrate Judge's Rationale for Ordering The Defendant's Release is Fundamentally Flawed

In ordering BURGIN's release, the magistrate judge went to great lengths to chastise the government for allegedly not bringing charges against BURGIN much earlier if it believed he was high-level narcotics trafficker.  The magistrate judge even suggested that a tax case should have been brought against BURGIN at some earlier time.  However, the magistrate judge's rationale ignores the prosecutor's discretion to lodge charges against an individual only when the prosecutor is convinced of a defendant's guilt beyond a reasonable doubt. See United States v. Hoffa, 385 U.S. 293, 310 (1966) ("Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction."); United States v. Watson, 423 U.S. 411, 431 (1976) (Powell, J., concurring) ("Good police practice often requires

postponing an arrest, even after probable cause has been established, in order to place the suspect under surveillance or otherwise develop further evidence necessary to prove guilt to a jury"). Furthermore, the government's decision to defer a potential tax prosecution to build a more serious drug case against BURGIN is obvious -- a tax prosecution would have exposed the government's drug investigation and it would have likely resulted in a minimal sentence if convicted.

In United States v. Lovasco, 431 U.S. 783 (1977), the Supreme Court, in the context of rejecting a due process claim regarding investigative delay, discussed at length the process that a prosecutor must go through before deciding whether to charge an individual with a crime:

> It requires no extended argument to establish that prosecutors do not deviate from "fundamental conceptions of justice" when they defer seeking indictments until they have probable cause to believe an accused is guilty; indeed it is unprofessional conduct for a prosecutor to recommend an indictment on less than probable cause. It should be equally obvious that prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt. To impose such a duty "would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself," United States v. Ewell, [383 U.S. 116, 120 (1966)]. From the perspective of potential defendants, requiring prosecutions to commence when probable cause is established is undesirable because it would increase the likelihood of unwarranted charges being filed, and would add to the time during which defendants stand accused but untried. These costs are by no means insubstantial since, as we recognized in Marion, a formal accusation may "interfere with the defendant's liberty, . . . disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends." 404 U.S., at 320, 92 S. Ct., at 463. From the perspective of law enforcement officials, a requirement of immediate prosecution upon probable cause is equally unacceptable because it could make obtaining proof of guilt beyond a reasonable doubt impossible by causing potentially fruitful sources of information to evaporate before they are fully exploited. And from the standpoint of the courts, such a requirement is unwise because it would cause scarce resources to be consumed on cases that

prove to be insubstantial, or that involve only some of the responsible parties or some of the criminal acts. Thus, no one's interests would be well served by compelling prosecutors to initiate prosecutions as soon as they are legally entitled to do so.

It might be argued that once the Government has assembled sufficient evidence to prove guilt beyond a reasonable doubt, it should be constitutionally required to file charges promptly, even if its investigation of the entire criminal transaction is not complete. Adopting such a rule, however, would have many of the same consequences as adopting a rule requiring immediate prosecution upon probable cause.

First, compelling a prosecutor to file public charges as soon as the requisite proof has been developed against one participant on one charge would cause numerous problems in those cases in which a criminal transaction involves more than one person or more than one illegal act. In some instances, an immediate arrest or indictment would impair the prosecutor's ability to continue his investigation, thereby preventing society from bringing lawbreakers to justice. In other cases, the prosecutor would be able to obtain additional indictments despite an early prosecution, but the necessary result would be multiple trials involving a single set of facts. Such trials place needless burdens on defendants, law enforcement officials, and courts.

Second, insisting on immediate prosecution once sufficient evidence is developed to obtain a conviction would pressure prosecutors into resolving doubtful cases in favor of early and possibly unwarranted prosecutions. The determination of when the evidence available to the prosecution is sufficient to obtain a conviction is seldom clear-cut, and reasonable persons often will reach conflicting conclusions. * * *

Finally, requiring the Government to make charging decisions immediately upon assembling evidence sufficient to establish guilt would preclude the Government from giving full consideration to the desirability of not prosecuting in particular cases. The decision to file criminal charges, with the awesome consequences it entails, requires consideration of a wide range of factors in addition to the strength of the Government's case, in order to determine whether prosecution would be in the public interest. Prosecutors often need more information than proof of a suspect's guilt, therefore, before deciding whether to seek an indictment.

Id. at 790-94 (footnotes omitted).[3]

---

[3] In Lovasco, the Supreme Court also recognized that courts should not determine when charges should be filed: "[I]f courts were required to decide in every case when the prosecution should have commenced, it would be necessary for them to trace the day-by-day progress of

During a recent oral argument before the Honorable Richard J. Arcara, U.S. District Court Judge, see Exhibit B, United States v. Lamario Mills, 11/5/2019 Transcript, Judge Arcara confronted the same argument in the detention context and found it meritless.  The following exchange occurred between Judge Arcara and defense counsel:

THE COURT:      How can you say he's not a danger to the community, based on what the government has just said.

MR. EOANNOU:    Very, very, very simply –

THE COURT:      He's charged in 19 counts.

MR. EOANNOU:    Very simply, Judge

THE COURT:      I'm very interested to hear.

MR. EOANNOU:    I can, because they started investigating for nine months, from the point they made their first buy to the last buy and left him out there making less than $100 buys.

THE COURT:      What does that prove?

MR. EOANNOU:    Well, exactly what Judge McCarthy said and he said that it undercuts the government's argument.  It undercuts the government's –

THE COURT:      How does it –

MR. EOANNOU:    Because if you are a danger to the community, go and arrest him.  You don't let him make –

THE COURT:      **That's a bogus argument**.

MR. EOANNOU:    It's not a bogus argument.  You don't have to make 11 –

THE COURT:      **I'm not persuaded by that at all**.

MR. EOANNOU:    Well, Judge, let me go through it.

---

each investigation. Maintaining daily records would impose an administrative burden on prosecutors, and reviewing them would place an even greater burden on the courts." Lovasco, 431 U.S. at 793 n.14.

THE COURT:          All right.

MR. EOANNOU:        Let me go through it.

THE COURT:          Go through it, but I'm not persuaded by what you're arguing. You need a better reason.

\* \* \*

THE COURT:          Why would the government – if they're conducting a criminal investigation, the person is – has been involved in criminal activity.  Your argument is that they should arrest him right away.  I don't like that argument at all.

MR. EOANNOU:        No.  My argument isn't arrest him right away.  My argument is, you had controlled buy after controlled buy after controlled buy. You don't need to wait nine months.  Nine months is –

THE COURT:          Why do you – I don't understand the logic of that argument.

MR. EOANNOU:        Because if he's a danger to the community and he's violent and he's selling drugs –

THE COURT:          That's your position.  That's not the government's position. They want to have a thorough investigation.  So, why would they stop the investigation earlier than they think is worthy to be stopped?  I don't get the connection in your argument.

\* \* \*

MR. EOANNOU:        Again, Judge, if the government thought he was such a danger, they wouldn't be leaving someone out on the street.

THE COURT:          Mr. Eoannou, you are an experienced criminal defense lawyer. When they're conducting – the government is conducting a criminal investigation, they need to make sure, I assume that it's thorough.  **They're not under any time requirement**.

See Exhibit B, Transcript at 5:11-6:13, 8:5-8:22, 13:18-13:25.


Here, if the magistrate judge's rationale is adopted, it would require a prosecutor to

prematurely charge individuals in an effort to support its case for detention.  As seen in the

Lovasco quote, above, the Supreme Court has made clear that imposing a duty upon prosecutors to prematurely charge individuals is rife with pitfalls. The repercussions stemming from the magistrate court's rationale would be detrimental to both the public and charged individuals by adding unwanted time in which a defendant would stand accused but untried, making it impossible to obtain the necessary proof for conviction, causing scarce resources to be consumed on cases that ultimately prove insubstantial, and resulting in only a handful of responsible individuals being charged for the conduct of criminal organizations. And when individuals are convicted, the sentencing court will not have a complete picture of the individual's criminal conduct if the government is required to charge at the earliest possible moment, rather than collecting evidence demonstrating the duration and breadth of the individual's criminal activity.[4]

What the magistrate court's rule does is ignore the complex factors that underlie prosecutorial discretion in favor of the magistrate judge's own opinion about when a case should have been charged. In addition to being directly contrary to the Supreme Court's own logic, such a rule creates immense tension between a magistrate judge's personal opinion and the governing detention criteria set out in § 3142(g). Taken to its logical conclusion, if charges are brought prematurely to satisfy an individual magistrate judge, the prosecutor would risk a court finding that the government's case is weak, therefore weighing in favor of a

---

[4] Furthermore, it would be a disservice to the public, and even reckless, for the government to charge someone engaged in substantial criminal activity with some minor charge, which will result in a sentence disproportionate to the defendant's criminal conduct, which then may also prevent, or inhibit, the government's ability to investigate and prosecute the scope of the defendant's more serious conduct. A thorough investigation is often necessary to develop evidence as to the others involved in substantial criminal activity. This goal would be thwarted if the government is required to charge a matter too early.

defendant's release under section 3142(g).  On the other hand, in cases involving a lengthy investigation against a defendant where this substantial evidence (like this one), a defendant would not be detained because the government methodically built its case and only charged it after it was convinced of a defendant's guilt beyond a reasonable doubt.  These reasons highlight precisely why § 3142(g) does not include a factor regarding the timing of a defendant's arrest.  See United States v. Brown, Crim. No. 17-00219-02, 2017 WL 4883375, at *3 (W.D. Pa. Oct. 30, 2017) (rejecting the defendant's argument that the government's decision to delay arresting him demonstrates he was not a danger to the community); United States v. Little, 235 F. Supp.3d 272, 279 (D.D.C. 2017) ("The Government is permitted to make its own determinations on when to indict a defendant and without evidence of abuse or some facts to support that the delay was due to a lack of danger, the delay does not affect the detention analysis.").

Moreover, this case is not one in which the government was in possession of evidence of serious criminal conduct for years or months ago and chose not to file charges.  Rather, once concrete evidence of serious criminal conduct (substantial drugs and money found in BURGIN's residences), sufficient to punish the defendant for the nature of his crimes, was obtained, the government immediately filed charges against BURGIN.

**B.**     **Section 3142(g) Factors Weigh in Favor of Detention**

**1.**     **First Factor:  Nature and Circumstances of Charge**

The defendant is charged in a narcotics conspiracy involving firearms and the seizure of more than $500,000 in United States currency.  In addition to the flawed reasoning to

support his decision, that is, the government should have arrested the defendant sooner, Magistrate Judge Schroeder's decision failed to consider the kilograms of drugs, handguns, assault rifles, the thousands of dollars seized from residences linked to BURGIN, and failed to given proper weight to the presumption of detention in this case. See United States v. Martir, 782 F.2d 1141, 1144 (2d Cir. 1986) ("[a] judicial officer conducting a detention hearing should, even after a defendant has come forward with rebuttal evidence, continue to give the presumption ... some weight"); United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985) (danger to the community includes "the harm to society caused by [the significant risk of continued] narcotics trafficking").

The seized evidence makes clear that the nature and circumstances of this offense are serious.  The sophisticated and lucrative nature of the defendant's drug organization weighs in favor of detention.  In addition, the possession of handguns and semi-automatic assault rifles serves to further demonstrate the defendant's danger to the community.  See United States v. Dillard, 214 F.3d 88, 93 (2d Cir. 2000) (noting that "firearms are conventionally regarded as essential equipment of criminal engaged in violent cime"). Given these facts, the nature and circumstances of the charges weigh in favor of detention.

2.    **Second Factor:  Weight of Evidence**

At the detention hearing, the magistrate judge did not even comment on the weight of the evidence other than mentioning the government's proffer was a "substantial one." Instead, he commented, at great length, on the government's alleged inaction, which served to rebut the presumption of dangerousness and risk of flight.  An unbiased review of

government's case demonstrates that the weight of the evidence is strong and favors detention.

Here, narcotics, firearms, and approximately $250,000 in cash were found at 56 Grimes, which is linked to the defendant through records, his presence in front of the location prior to the warrant being executed, and mail in his name found at 56 Grimes. Furthermore, the March 2017 video recording between BURGIN and a source solidify the government's proof that BURGIN is the head of a large-scale narcotics distribution and money laundering organization.

### 3.    Third Factor: History and Characteristics of the Defendant

The third factor also weighs in favor of the defendant's detention. The defendant has been operating a sophisticated drug organization for more than a decade. Additionally, when interviewed by the United States Probation Office ("USPO") for his Pretrial Services Interview, the defendant lied to the USPO about his employment history, his ownership of 54 Bennett Village Terrace, and his business in Jamaica. Magistrate Judge Schroeder simply ignored this information, even though the government's proffer made clear that the information provided by the defendant for the report was false. See United States v. Williams, No. 18-MR-69-A, 2018 U.S. Dist. LEXIS 32105, at *12-13 (W.D.N.Y. Feb. 27, 2018) (Arcara, J.) ("If the Defendant is willing to lie to a federal judge in an effort to obtain his release, the Court is not confident that the Defendant understands the seriousness of what he is charged with, and the Court is not sure that the Defendant fully appreciates the consequences of continuing to commit crimes while on release."). Finally, in ordering defendant Burgin's release, Magistrate Judge made mention of other defendants with more

serious criminal histories who the government agreed to be released on conditions.  See Exhibit E at 48:6-8.  Even if true, it is irrelevant to whether or not defendant BURGIN is a danger to the community.

      a.    ***Defendant's Criminal History***

The defendant does not have a criminal history, but according to source information and financial information, he has been operating a significant drug distribution network for more than a decade.

      b.    ***Defendant's Family and Community Ties***

Although the defendant has ties to the community, "Congress specifically found when adopting the Bail Reform Act of 1984 that a defendant's 'community ties' have 'no correlation with the question of the safety of the community.'"  United States v. Hill, 10-CR-191-A, 2011 WL 5403276, at * 9 (W.D.N.Y. Nov. 7, 2011) (Arcara, J.).  In addition, while BURGIN apparently has strong family ties, his co-defendant is his nephew, so the significance of these ties should be given little weight.  Furthermore, family ties "do little to rebut the presumption of dangerousness from this high level narcotics trafficking conspiracy."  United States v. Arena, 878 F. Supp. 439, 443 (N.D.N.Y. 1995) (citing United States v. Rodriguez, 950 F.2d 85, 89 (2d Cir. 1991)).  Finally, it is noted that even if it is assumed that BURGIN has strong family and community ties, these ties have not deterred the defendant from committing serious crimes over a lengthy period of time.  With this history, there is not reasons to believe the defendant will not return to his criminal ways if he is released from pretrial detention.er

c.      *Defendant's Employment History*

The defendant indicated to probation that he has been employed as an off-the-books in the construction business for the previous ten (10) years.  Significantly, the defendant omitted any reference to owning a business in Jamaica, as the defendant admitted to a source, or owning a local debt collection business, as his attorney claimed at the detention hearing. When BURGIN was asked by the Pretrial Services Officer about resources for bail, he indicated his family would be willing to assist with bail.  See Pretrial Services Report.  He apparently did not mention his own resources for bail, even though at the hearing BURGIN's attorney indicated he had several lucrative years at a debt collection business.

The investigation has revealed that the defendant is the head of a large-scale narcotics distribution organization that supplies cocaine, fentanyl, and marijuana to large portions of the City of Buffalo – not that he works at a construction business.  The large sums of cash found in the defendant's properties, significant expenditures, and the possession of numerous firearms, including semi-automatic assault rifles, are consistent with his narcotics trafficking activities.  The defendant's lack of verifiable employment history should be an additional factor weighing against his release, not in favor of it.

d.      *Drug Use*

The defendant does not have a history of drug use.  While this is a positive for the defendant, it does not outweigh the danger posed to the community by the defendant's extensive drug trafficking.

e.   *Access to Large Amounts of Cash and Business Connections in Jamaica*

Although the magistrate judge ordered the defendant released on $100,000 secured by cash or property, the investigation has directly linked the defendant to over $500,000 in cash seizures and demonstrates the defendant's known expenditures far exceed his reported income.   Based on the sheer scope of this narcotics conspiracy, it is probable that the defendant has access to even more money, which he could use to facilitate his flight from this country and still reimburse his family for their losses.   His business ties to Jamaica serve to further demonstrate his risk of flight.

4.   <u>Fourth Factor</u>: **Nature and Seriousness of the Danger to Any Person or the Community**

In rendering his decision, the magistrate judge erroneously faulted the government for not charging the defendant sooner.   Based on this argument, the magistrate judge found that the government's alleged inaction in arresting the defendant sooner, served to rebut the presumption that the defendant posed a significant danger to the community.   Then, without a discussion of any of the facts demonstrating defendant BURGIN's danger to the community, the magistrate judge simply relied on the pretrial services report to support his release decision.

As detailed above, the serious nature of the defendant's narcotics trafficking poses a danger to the community.   Even if there were no evidence that the defendant posed a threat to individuals in the community, the Second Circuit has established that "it is clear that the harm to society caused by narcotics trafficking is encompassed within Congress' definition of 'danger.'" <u>United States v. Leon</u>, 766 F.2d 77, 81 (2d Cir. 1985).   <u>See</u> <u>also</u> <u>United States v.</u>

Acosta-Tavera, 697 F. App'x 927, 930 (10th Cir. 2017) ("[T]he risk that a defendant will continue to engage in drug trafficking constitutes a danger to the safety of any other person or the community."). This is especially true in cases "involve[ing] relatively large quantities of dangerous and potent drugs." See United States v. Morrison, No. 16-MR-118, 2016 WL 7421924, at *4 (W.D.N.Y. Dec. 23, 2016) (Vilardo, J.). Finally, when the government seeks to establish that a defendant is a danger, it need not show a record of violence or dangerous conduct. "Although a prior record of violence eases the government's burden of showing dangerousness, it is not essential." United States v. Rodriguez, 950 F.2d 85, 88–89 (2d Cir. 1991).

### 5. The Bond Amount Imposed by the Magistrate Court and Home Detention Condition Are Insufficient to Protect Society or Assure the Defendant's Appearance

The magistrate judge allowed the defendant to be released upon the posting of a $100,000 cash or property bond. This amount is less than half of what was found in 56 Grimes. It is also half of what was found at 73 Rogers, which the defendant admitted to owning. Simply put, the bond amount and home detention condition will not assure BURGIN's appearance in court and it will not mitigate the defendant's danger to the community. See United States v. Ellison, 2018 U.S. Dist. LEXIS 28787, *11 (W.D.N.Y. Feb. 22, 2018) (finding that "electronic monitoring while on home detention or home incarceration, even with relatives posting financial security, will not eliminate the specific danger that the defendant poses to the community.").

## V.   <u>CONCLUSION</u>

The release of the defendant poses a risk of flight and a serious risk of danger to the community.  No condition or combination of conditions can lessen this risk to a point where the defendant's appearance, nor the safety of the community or other individuals, can be reasonably assured.  The magistrate judge erred by not fully addressing the factors set forth in 18 U.S.C. §3142(g), and instead turning his focus on the length of the government's investigation.  For the reasons stated above, the government respectfully requests that the District Court revoke the Magistrate Judge Schroeder's decision, and order the defendant be detained pending trial.

DATED:  Buffalo, New York, February 28, 2020.

JAMES P. KENNEDY, JR.
United States Attorney

BY:   s/TIMOTHY C. LYNCH
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
716/843-5846
Timothy.Lynch@usdoj.gov